### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| TERESA COLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | Case No. 10-1282-JAR |
| | ) | |
| HAWKER BEECHCRAFT | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### MEMORANDUM AND ORDER

Plaintiff filed this action alleging claims of discrimination on the basis of race under Title

VII of the Civil Rights Act and 42 U.S.C. § 1981, retaliation under Title VII and the Family

Medical Leave Act ("FMLA"), and disability discrimination under the Americans with

Disabilities Act ("ADA").  This matter is before the Court on defendant Hawker Beechcraft

Corporation's ("HBC") Motion for Summary Judgment (Doc. 55).  The motion is fully briefed

and the Court is prepared to rule.  As described more fully below, defendant's motion for

summary judgment is granted.

### I.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no

genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[1]

In applying this standard, the court views the evidence and all reasonable inferences therefrom in

the light most favorable to the nonmoving party.[2]  "There is no genuine issue of material fact

---

[1]Fed. R. Civ. P. 56(a).

[2]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[7]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a

---

[3]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998)).

[5]*Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

[6]*Spaulding v. United Trasp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986)).

[7]*Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler,* 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[8]*Anderson,* 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co.,* 475 U.S. at 587).

[9]*Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

rational trier of fact could find for the nonmovant."[10]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[11]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[12]  When examining the underlying facts of the case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.[13]

## II.     Background

### A.     Plaintiff's Declaration

In the reply, defendant asks the Court to strike or disregard certain statements in plaintiff's declaration, attached to the response,[14] because they contradict plaintiff's prior sworn deposition testimony regarding her complaints of race discrimination between July 2007 and July 2008.  Defendant points to plaintiff's deposition testimony that she complained to Candye Daughhetee in Human Resources about race discrimination in June 2008, and before that her only complaint about race discrimination was in 2005.  Plaintiff's declaration, in contrast, states that she complained of race discrimination on July 11, 2007, April 1, 2008, April 14, 2008, and

---

[10]*Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler,* 144 F.3d at 671); *see Kannady,* 590 F.3d at 1169.

[11]*Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[12]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

[13]*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[14]Doc. 63, Attach. 2.

June 4, 2008.

The Court is mindful that 'the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting [evidence] contradicting his own prior testimony."[15]  But the Court is required to "determine whether the conflicting affidavit is simply an attempt to create a 'sham fact issue' before excluding it from summary judgment consideration.[16]  Cases in which an affidavit raises a sham issue are "unusual."[17]  In determining whether plaintiff's declaration creates a sham fact issue, the Court considers whether: "'(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain.'"[18]

The Court is unable to find that plaintiff's declaration creates a sham fact issue in this case as to her complaints of discrimination prior to June 2008.  Plaintiff did not testify at her deposition that she complained of discrimination on any other date.  However, in her declaration, plaintiff contends that she complained of race discrimination on several other dates prior to June 2008.  These are not conflicting statements, but instead, plaintiff has included facts in her declaration that were not elicited from her during her deposition testimony, on direct examination or otherwise.  Defendant does not point to portions of plaintiff's deposition

---

[15]*Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986).

[16]*Law Co. v. Mohawk Constr. & Supply Co.*, 577 F.3d 1164, 1169 (10th Cir. 2009) (quotation omitted).

[17]*Id.*

[18]*Id.* (quoting *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001)).

testimony where she denied complaining to HBC about race discrimination prior to June 2008. Defendant's argument that other witnesses' deposition testimony controverts plaintiff's account of these meetings goes to the weight of plaintiff's testimony, not to its admissibility. Defendant's request to strike plaintiff's declaration is denied.

### B.   Uncontroverted Facts

The following facts are either uncontroverted, stipulated to, or viewed in the light most favorable to plaintiff.

Defendant is a manufacturer of aircraft, which are utilized in general aviation and for military use.  Plaintiff, who is African-American, was hired by defendant on June 15, 1987. When plaintiff was hired in 1987, she was classified as an Order and Stock Control Clerk.  From 2001 to the time of her termination, plaintiff was classified as a Media Production Associate. She worked in defendant's Technical Manual Distribution Center ("TMDC"), which was responsible for providing aircraft information to aircraft owners and pilots.  Plaintiff's regular work hours were 8:00 a.m. to 4:30 p.m.  Plaintiff's job was to work in the call center, taking customer orders, managing subscriptions, and providing safety of flight information.  The call center employees also answered questions, worked with billing, and took care of filing.  The calls came to the call center, and rolled from one number to the next, so that they were evenly dispersed.  If someone was not at their desk, available to take calls, the call would roll to the next employee.  There were generally three employees assigned to take calls.  If one of the employees regularly assigned to take calls was absent, then other employees, including the supervisors, would have to log on to deal with incoming calls.

On February 23, 2005, while working in the TMDC, plaintiff was involved in a physical

5

altercation with a coworker, Shelley Huffman.  Plaintiff claims that, about a year prior to the

incident, Huffman had used a racial slur towards plaintiff and stated that she was not used to

working with black people.  Plaintiff claims that she verbally reported that remark to Sharon

Schlegel, who was her immediate supervisor at the time.  Immediately prior to the February 2005

confrontation, plaintiff claims that Huffman verbally antagonized her about something work-

related, which prompted plaintiff to confront Huffman at her desk.  Plaintiff testified that

Huffman directed a racial slur at her during the altercation.  Huffman stated that plaintiff placed

her hands on her neck in an attempt to choke her, and witness accounts state that plaintiff shoved

Huffman.  Plaintiff claims she does not remember anything about the incident after confronting

Huffman at her desk but adamantly denies that she choked Huffman.  As a result of the

altercation, plaintiff was suspended without pay for a period and was required to consult with

representatives of HBC's employee assistance program, as well as complete whatever counseling

they recommended.  In addition, the whole department underwent a week-long counseling

session and training regarding communication.  Plaintiff complained to Human Resources in

2005 regarding race discrimination surrounding this incident.

In July 2007, plaintiff observed a confrontation in her department between Niki Griffin,

who is Caucasian, and Gina Brazleton, who is African-American.  Plaintiff complained to her

supervisors that management did not address the situation and that Griffin was part of the

problem.  In conjunction with this incident, on July 11, 2011, plaintiff told Schlegel and

Schlegel's manager, Kathy Sade, that she believed the confrontation was related to race.

Plaintiff also complained to Sade at this time about Schlegel, that Schlegel talked down to her,

raised her voice telling her she was the boss, and thought that plaintiff was stupid.  Plaintiff

contends that after the 2005 altercation with Huffman, her supervisors treated her poorly.  She

contends that they did not talk to her very much and that Schlegel raised her voice at plaintiff

multiple times, including lecturing plaintiff about instigating the conflict between Griffin and

Brazleton.

***Attendance Policy***

During her time in the TMDC and at the time of her termination, plaintiff was classified,

for payroll purposes, as a nonexempt employee.  Defendant has an attendance policy for the

TMDC's nonexempt employees. The policy states that an employee's absence will be excused, if

covered by a paid holiday, vacation, jury duty, military leave, bereavement leave, sick leave,

short term disability, approved FMLA leave, workers compensation leave, or a medical leave of

absence.  The policy states that, if an employee wishes to use paid vacation, he or she must give

at least twenty-four hours advance notice to management in order to allow for organizational

planning.  The policy further provides that an employee must have approval from supervision to

use vacation to cover an absence.  Vacation had to be used in increments of four or more hours.

Plaintiff admits that an employee's ability to use vacation to cover an unexcused absence

depended on how many other people were gone on a given day, as well as how many times a

certain employee had called in sick in the morning requesting to use vacation and without

advance notice.

The policy regarding unexcused absences or tardies is as follows:

> An unexcused absence is any time away from work not covered by
> [an excused absence] including tardiness.  Employees are expected
> to be at their work stations and ready to begin work at 8:00 AM.
> Excusing tardiness is at the discretion of supervision.  If you know
> you will be more than 5 minutes late reporting for work you are
> required to call your supervisor and advise them.  Leaving a

voicemail is not acceptable for reporting tardiness or absence.  If
you are unable to reach your supervisor directly you need to report
thru [sic] the TMDC Call Center . . . . You must speak to someone
to report.

Unsatisfactory attendance is determined by an assessment of
individual employee circumstances  . . . . This process involves
the individual manager's judgment and discretion after reviewing
the employee's specific set of circumstances.  If an individual is ill
and out of Sick Leave/ETO the absence is unexcused until: a)
FMLA is approved by the Company or b) vacation time is
approved by the supervisor.  Unexcused absences will be
monitored by supervision. The TAW system will be used if an
employee's attendance is in question.[19]

The policy states that consequences for occurrences of unsatisfactory attendance,

including unexcused absences and tardiness, may include corrective action by verbal and written

counseling, and that subsequent occurrences of unsatisfactory attendance may result in further

disciplinary action, including termination.  The policy also provides that an employee may

request from supervision, makeup time for absences.  If approval is granted, the makeup

time has to be made up between 7:00 a.m. and 5:00 p.m., during the same work week.

Sade and Schlegel were the managers who determined whether plaintiff's absences from

work were excused or unexcused.  Both Sade and Schlegel testified that if an employee was

absent from work because of sickness or medical condition and requested to use vacation time to

cover the absence, they would typically grant the employee's request.

HBC had an unwritten policy that an employee may only make up time when a

supervisor is available and present.  However, plaintiff routinely was allowed to make up time

for absences and tardies after 5:00 p.m., even when a supervisor was not available.  Plaintiff

---

[19]Doc. 56, Ex. 9.

knew that, in accordance with the attendance policy, the system that employees used to log in at the TMDC, Telephony At Work ("TAW"), was the final arbiter regarding whether an employee was at work on time.

***Plaintiff's FMLA Leave and Attendance***

Plaintiff had successfully used FMLA leave since at least 2002 when she requested and was approved for two months leave in order to have a hysterectomy. Plaintiff continued to utilize FMLA leave thereafter. In 2003, plaintiff was approved for approximately two weeks of FMLA leave for treatment of anxiety and depression. Later in 2003, she was approved for leave due to neck pain and muscle spasms. In 2004, plaintiff requested and was approved for FMLA leave on several occasions, including leave due to fibromyalgia, chronic pain, neck pain, blood pressure, and Crohn's Disease. One of plaintiff's 2004 FMLA requests was denied because she had not provided any certification indicating why the leave was needed. Plaintiff was given additional time to produce the necessary information, but company records do not indicate that she did so.

In 2005, plaintiff requested and was approved for several periods of FMLA leave, including leave due to depression and fibromyalgia. She was approved for FMLA leave on April 5 for the period March 14 through March 28; April 8 for the period March 29 through April 5; June 16 for the period June 15 through August 15; September 2 for the period August 22 through 24; and October 3 for the period September 8 through 9.[20] Plaintiff's HBC records indicate that

---

[20]Defendant asserts that plaintiff's FMLA request for September 8–9 was denied, and that she was given two additional weeks to provide the necessary provider's certification but that company records indicate she did not do so. But defendant's next statement of fact is that "On October 3, 2005, plaintiff was approved for FMLA leave for fibromyalgia," citing a Memorandum from Human Resources approving plaintiff's FMLA leave request for the period of September 8–9. Viewing the evidence in the light most favorable to plaintiff, this leave period was approved after the original denial on September 14.

she was either absent for an entire day or worked less than a full shift without having available

sick leave, vacation, holiday pay, or FMLA leave on forty-one occurrences in 2005: February 7,

17, 23, 25; February 28 through March 13 (disciplinary suspension for the Huffman altercation);

April 13, 19, 27; May 2, 5, 10, 16, 18, 19; June 1, 2; August 17; September 28; October 3, 10,

12, 27, 28; November 15, 23; and December  13, 15, and 23.

In October of 2005, HBC revamped its FMLA program.  All employees received a

memorandum noting what information would be required.  In terms of processing, the

memorandum stated that employees may file their FMLA request or provide additional

documentation required to Human Resources by fax, interoffice mail, or by dropping it off at the

Security Guard Station.

In 2006, plaintiff did not request FMLA leave for any of her absences.  Plaintiff's HBC

records indicate that she was either absent for an entire day or worked less than a full shift

without having available sick leave, vacation, holiday pay, or FMLA leave on forty-eight

occurrences in 2006: January 19, 26, 30, 31; February 6, 10, 20; April 3, 18, 24, 26; May 11, 31;

June 2, 8, 14, 19; July 6, 10–13, 27; August 4, 8, 14, 28; September 11, 13, 14, 26; October 2,

11, 12, 17, 23, 24, 25; November 9, 15, 16, 21, 27, 29; and December 7, 14, 15, 18.

In 2007, plaintiff requested and was approved for FMLA leave between September 26

and November 5, for fibromyalgia, depression, and hypertension.  Defendant's records do not

indicate that plaintiff sought FMLA leave for any other absences in 2007.  Plaintiff's HBC

records indicate that she was either absent for an entire day or worked less than a full shift

without having available sick leave, vacation, holiday pay, or FMLA leave on thirty-seven

occurrences in 2007: January 9, 15, 22; February 2, 8, 13, 16, 26; March 2, 13, 16, 19, 21, 30;

April 2, 6, 12, 16, 27; May 8, 11, 14, 24, 25; June 4, 12, 26; July 10, 16; August 14, 20, 21, 30;

September 5, 12, 17, 18; November 7, 9, 13, 16, 28; and December 21.

Plaintiff was counseled for attendance on September 20, 2007 for excessive absences or

tardiness.  Schlegel issued a memorandum to plaintiff noting that, as of September 7, 2007, she

had incurred "7 occurrences of either partial or full days of absenteeism since January 1, 2007,

the most recent being on August 21st. . . .  Failure to show immediate, continued, and sustained

improvement in attendance or to follow the above directions will result in disciplinary action up

to and including termination."[21]  The memorandum states that management expects employees to

"exercise reasonable discretion" in utilizing benefits such as sick leave, and that it expects to be

notified in advance of planned time away from work.  This was the first specific written warning

plaintiff received from HBC regarding attendance.

On April 8, 2008, plaintiff signed an FMLA request that was received by Human

Resources on April 17, 2008 for fibromyalgia, bulging disc, and migraine on April 7 through 11.

Defendant approved this FMLA leave request.  On May 7, plaintiff was approved for FMLA

leave for migraine, fibromyalgia, and bulging disc on March 30, April 1, and April 2.  Plaintiff's

HBC records indicate that she was either absent for an entire day or worked less than a full shift

without having available sick leave, vacation, holiday pay, or FMLA leave on ten occurrences in

2008: January 8, 14, 22, 25; February 27; March 4, 26; May 27, 28; June 9.

On April 14, 2008, prior to her April 17 and May 7 FMLA approvals, plaintiff received

another written warning for unexcused absences and tardiness on April 1, 2, 9, 10, and 11.

Plaintiff also met with Sade and Schlegel on April 14 to discuss this written warning.  Plaintiff

---

[21]Doc. 57, Ex. 43.  In fact, even according to plaintiff's factual recitation, she had accumulated substantially
more than seven occurrences of absenteeism as of September 7, 2007.

was advised that if her attendance did not improve, she could be subject to termination. Plaintiff's HBC records indicate that she was allowed to make up one hour of her tardiness from April 1 (out of a total one and one-half hours tardiness) and all of her tardiness from April 2. Prior to April 1, 2008, plaintiff was routinely allowed to make up time for absences and tardiness after 5:00 p.m., even when a supervisor was not available.

On May 27, 2008, plaintiff was late arriving to work.  Plaintiff asked Schlegel if she could make up the time and Schlegel told plaintiff that this was not possible and it was an unexcused absence.  On May 28, 2008, plaintiff left Schlegel a voice mail advising that she would not be at work that day because she was nauseous and taking medication.  Schlegel notified Daughhetee in Human Resources that this absence was unexcused because she left a voicemail instead of speaking to someone physically.

Plaintiff met with Daughhetee on June 4, 2008.

On June 9, 2008, Schlegel reported to Daughhetee that plaintiff arrived late that morning and did not log in until 8:16 a.m.  Plaintiff denies arriving late that day and contends that she sometimes had difficulty logging onto the TAW system.

Plaintiff does not know how her use of vacation compared to other employees in her department who were allowed to use vacation to cover unexcused absences.  In 2008, the TMDC call center attendance notes show that other employees who were tardy received verbal warnings.  Plaintiff recalls an instance when Schlegel told her that if she "kept using FMLA or being absent or so, that there was a chance that I was going to be terminated."[22]

---

[22]Doc. 56, Ex. 7 at 269.

*Performance Reviews and Pay*

From 2001 until the time of her termination, plaintiff was classified as a Media

Production Associate, Grade N75.  She was earning $18.10 per hour when she was terminated.

Plaintiff's work performance in 2003, 2004, and 2006 was evaluated as "meets expectations."

However, her performance evaluations all noted that she struggled with attendance and tardiness

issues, which increased the burden on her co-workers and decreased her productivity.  Plaintiff

received merit increases in 2003–2007 when her performance reviews showed that she had "met

expectations."  These merit increases took her hourly wage from $16.11 to $18.10.

The 2007 Performance Metrics show that plaintiff completed significantly fewer

subscriptions and sales orders per day than did her peers in the call center.  For a period of time

in 2007, however, plaintiff was assigned to handle billings and not subscriptions.  In 2007,

plaintiff was also the subject of two customer complaints and was counseled regarding those

customer complaints.  Plaintiff's work performance for 2007 was evaluated by Sade and

Schlegel as "does not meet expectations." Her performance evaluation states in part:

> In the first quarter of 2007, Teresa's tasks were to handle all
> subscription renewals versus the full Call Center duties, which
> meant her work load was significantly less than others in the
> department.  Previous redistribution of duties transpired due to
> Teresa's tardiness and absenteeism causing problems with
> telephone coverage and distribution of work in the Call Center.
> Staffing changes in late April 2007 made it necessary for her to
> resume her former duties so she again had the same responsibilities
> as other personnel in the call center.  However some of the same
> problems still existed due to her tardiness and absenteeism,
> resulting in Teresa's contributions significantly not meeting our
> expectations compared to her years of experience in the
> department.
>
> Regarding job performance, department data shows that Teresa's
> numbers are lower than other personnel doing the same or similar

tasks.  Her customer service skills were also less than satisfactory supported by customer complaints received by the Manager of Technical Publishing concerning poor customer service, lack of knowledge and a subscription renewal error.  Teresa was formally counseled by Kathy Sade on her poor customer service and lack of follow-through when her basic job knowledge supersedes others in the department.

As the most experienced employee in the Call Center, Teresa should be a mentor to all Call Center employees.  However, both new employees have outperformed Teresa and did so within a short time of their arrival.  Low numbers, absenteeism/tardiness and customer complaints comprised Teresa's 2007 performance rating of Does Not Meet.[23]

Plaintiff signed her performance evaluation on April 1, 2008.

On or before April 1, 2008, plaintiff met with Sade and Schlegel to discuss this 2007 performance review.  Plaintiff indicated that her health problems had played a big part in her attendance and performance shortfalls and that the performance evaluation was "totally unacceptable."  Plaintiff did not receive a merit increase in 2008.  Sade testified that this performance rating would have started a performance improvement plan ("PIP") for plaintiff.  In fact, her supervisors discussed placing plaintiff on a PIP and even prepared such a document; however, it was never given to her.

Niki Griffin, who is Caucasian, held the same title and grade as plaintiff and was earning $16.73 per hour as of May 2008.  She received a $.57 merit increase in her hourly wage in 2008. Kimberly Call, who is Caucasian, held the same title and grade as plaintiff and was earning $16.40 per hour as of May 2008.  Call received a $.48 merit increase in her hourly wage in 2008.

Plaintiff complained to supervision about her pay and was told that pay was determined

---

[23]Doc. 57, Ex. 40.

by performance reviews.  She understood that her department had a budget for raises that was divided amongst employees based on their performance reviews.

*Plaintiff's Termination*

Plaintiff called in sick to work on June 10 and 11, 2008.  Schlegel reported plaintiff's absences to Daughhetee.  Plaintiff requested to use vacation time to cover both absences and received verbal approval to do so; Schlegel typically approved a request to use vacation time when plaintiff was ill so long as she had such time available.  HBC's records show plaintiff was approved to use vacation on June 11, but not on June 10.  On June 12, plaintiff prepared and signed an FMLA leave request for her absences on June 10 and 11, accompanied by a provider certification, citing bulging disc and fibromyalgia.  Plaintiff faxed these forms on June 12 to Sade, Daughhetee, and Greg Graber, who was a Director and Sade's superior, and either faxed or hand-delivered them to Occupational Health Services the same day.  The form contains a "Received Hawker Beechcraft" stamp for June 16, 2008.

Plaintiff was involuntarily terminated on June 13, 2008.  The termination was conducted by Daughhetee and Graber; Sade was not present.  Neither Sade nor Schlegel participated in the decision to terminate plaintiff on that day; however, Sade testified that she had previously indicated to Daughhetee and Graber that she would recommend termination if plaintiff's attendance problems did not improve.  Sade learned from Daughhetee by email that plaintiff had been fired.  During the termination meeting, plaintiff does not recall whether she mentioned any allegations of race discrimination or whether she felt she was being punished for having used FMLA, and she does not think she mentioned any allegations of disability discrimination.

Plaintiff submitted a second FMLA request for June 10 and 11, again stating that leave

15

was needed for bulging disc and fibromyalgia and that she was suffering from carpal tunnel. In support of this request for leave, plaintiff submitted a certification signed by Dr. Hai Truong, stating that plaintiff, who had not been seen since May 5, 2008, was suffering from stress, fibromyalgia, carpal tunnel, and bulging disc. This request was received by Human Resources on June 17, 2008, four days after plaintiff's termination. Neither of plaintiff's FMLA requests for June 10 and 11 were addressed because plaintiff had been terminated prior to their receipt. Plaintiff has no reason to dispute the accuracy of the stamps on the FMLA requests indicating the dates that they were received by defendant's Human Resources department.

No one ever said or suggested to plaintiff that her termination was based on her race. Plaintiff admits that she never heard any other management or supervisory employee make a critical remark regarding employees using FMLA.

Plaintiff filed a complaint with the Kansas Human Rights Commission ("KHRC") on October 13, 2008. The complaint alleged discrimination on the basis of age, race, and disability. Plaintiff's KHRC complaint was dual-filed with the Equal Employment Opportunity Commission ("EEOC").

## III.    Discussion

### A.    McDonnell Douglas Standard

Plaintiff brings four claims of relief in this case: (1) discrimination on the basis of race under Title VII of the Civil Rights Act and 42 U.S.C. § 1981, (2) retaliation under Title VII, (3) retaliation under the FMLA, and (4) disability discrimination under the ADA. The parties agree that all of these claims must be decided under the familiar *McDonnell Douglas v. Green*[24]

---

[24]411 U.S. 792, 802–05 (1973).

burden-shifting framework because plaintiff relies on circumstantial evidence.[25]  Under

*McDonnell Douglas*, plaintiff initially bears the burden of production to establish a prima facie

case of discrimination or retaliation.[26]  The burden of establishing the prima facie case is "not

onerous."[27]  If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate

a facially nondiscriminatory reason for its actions.[28]  If defendant articulates a legitimate

nondiscriminatory reason, the burden shifts back to plaintiff to present evidence from which a

jury might conclude that defendant's proffered reason is pretextual, that is, "unworthy of

belief."[29]

### B.    Race Discrimination

To establish a prima facie case of race discrimination, plaintiff must generally show that

(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3)

the challenged action took place under circumstances giving rise to an inference of

discrimination.[30]   The first two elements of plaintiff's prima facie case are not in dispute.

---

[25]*See, e.g.*, *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, -- (10th Cir. 2011) (applying to Title VII and §
1981 discrimination and retaliation claims); *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1217 (10th Cir. 2010)
(applying to ADA discrimination claim); *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th
Cir. 2006) (applying to FMLA retaliation claim).

[26]*McDonnell Douglas*, 411 U.S. at 802.

[27]*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 238, 253 (1981).

[28]*Id.*; *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007).

[29]*Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting *Randle v. City of Aurora*, 69
F.3d 441, 451 (10th Cir. 1995)).

[30]*EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 & n.5 (10th Cir. 2007) (discussing how elements of prima
facie case in discrimination cases vary depending on context).  In the Tenth Circuit, the prima facie case no longer
requires a "similarly-situated person" comparison.  *See Sorbo v. UPS*, 432 F.3d 1169, 11173 (10th Cir. 2005).  While
the third element may be shown by evidence that the employer treated similarly-situated employees more favorably,
"such proof is just one sufficient means to do this and should not itself be mistaken as an indispensable element of
the prima facie case." *Sorbo*, 432 F.3d at 1173–74.

Plaintiff asserts discrimination for three distinct adverse actions: (1) her 2007 performance review; (2) the decision not to give plaintiff a merit increase in pay in the spring of 2008; and (3) her termination on June 13, 2008.[31]   The parties dispute whether plaintiff has come forward with evidence to establish a genuine issue of material fact on the third element of her prima facie.

Defendant has articulated a legitimate nondiscriminatory reason for each of the three alleged adverse actions.  Defendant contends that plaintiff was not awarded a merit increase in 2008 based on her performance evaluation in 2007.  It maintains that plaintiff's 2007 performance evaluation was based on continued violations of defendant's attendance policy and plaintiff's unsatisfactory work performance.  Defendant contends that plaintiff was terminated for continued absences and tardies after receiving written warnings in September 2007 and April 2008.

Plaintiff points to six pieces of circumstantial evidence in support of her discrimination case and the Court discusses each in turn, mindful not to conflate each distinct adverse employment action alleged by plaintiff.  "'Regardless of whether [the Court] analyze[s] the plaintiff's evidence 'in reference to the prima facie case or the business justification versus pretext inquiry, . . . if the court correctly concludes that the evidence of discrimination/pretext fails as a matter of law, summary judgment for the defendant is the proper result.'"[32]

---

[31]As a general rule, an administrative charge must be filed with the EEOC within 180 days of the occurrence of the alleged unlawful employment practice.  *See* 42 U.S.C. § 2000e-5(e)(1).  But if a complainant "institutes proceedings with a state or local agency with authority to grant or seek relief from the practice charged," the time limit for filing with the EEOC is extended to 300 days." *EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 110 (1988).  Generally, "[t]he EEOC charging period is triggered when a discrete unlawful practice takes place." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).  Plaintiff filed her administrative charge on October 13, 2008.  Therefore, to be timely, the unlawful practices must have taken place after December 18, 2007.  All three of the events cited by plaintiff occurred after this date, so they are timely.

[32]*PVNF, L.L.C.*, 487 F.3d at 800 n.5.

### 1.    Treatment of Similarly Situated Employees

Plaintiff argues that HBC treated similarly situated Caucasian employees more favorably with respect to performance reviews and merit increases.  Specifically, plaintiff asserts that two other employees, Griffin and Call, received favorable performance reviews and pay increases in the spring of 2008.  A plaintiff may show pretext by proving that similarly-situated non-protected individuals were treated more favorably after committing comparable conduct.[33] "Similarly-situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."[34]  To determine whether employees are similarly situated, the Court "should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees."[35]

While it is uncontroverted that Griffin and Call received merit increases in 2008, there is no evidence in the record about Griffin and Call's performance reviews for 2007.  There is no evidence that these employees had attendance and performance issues comparable to plaintiff's documented attendance and performance problems in 2007.  Therefore, evidence that Griffin and Call received merit increases in 2008 does not raise a genuine issue of material fact about whether plaintiff was discriminated against because of her race, or whether defendant's cited reason for her poor performance review, and the denial of a merit increase in her wage, was merely a pretext for discrimination.  Moreover, plaintiff admitted during her deposition that she

---

[33]*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000).

[34]*Rivera v. City & County of Denver*, 365 F.3d 912, 922–23 (10th Cir. 2004) (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir.1997)) (internal quotation marks omitted).

[35]*McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006).

does not know how her use of vacation compared to other employees in her department who were allowed to use vacation to cover unexcused absences. In 2008, the TMDC call center attendance notes show that other employees who were tardy received verbal warnings.  Because there is no evidence that similarly situated individuals were treated more favorably by plaintiff's supervisors, the Court is unable to find that this creates a genuine issue of material fact on either the prima facie case or pretext.

### 2.        Subjective Criteria

The use of subjective criteria "provides an opportunity for unlawful discrimination"; however, it is insufficient, standing alone, to establish discrimination.[36]  Plaintiff points to the TMDC attendance policy, which states that an unsatisfactory attendance determination involves the individual manager's judgment and discretion, and contends that this subjective standard provided an opportunity for discrimination.  In support of this argument, plaintiff cites *Garrett v. Hewlett-Packard Co.*, where the Tenth Circuit explained that employee evaluations governed by subjective criteria are suspect.[37]  "This prevents the employer from conjuring up negative evaluations and subsequently using those negative evaluations as a rationale for terminating the employee."[38]

On this point, the parties controvert whether the determination of "unsatisfactory attendance" in the TMDC attendance policy is based on subjective criteria.  Plaintiff points to the language of the policy, and to Daughhetee's deposition testimony, admitting that the

---

[36]*Bauer v. Bailar*, 647 F.2d 1037, 1046 (10th Cir. 1981); s*ee, e.g.*, *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1218 (10th Cir. 2002) (collecting cases).

[37]305 F.3d at 1218.

[38]*Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, -- (10th Cir. 2011) (construing *Garrett*, 305 F.3d at 1218).

provision could be viewed as a subjective policy since it is left to the manager's discretion and judgment.  Defendant argues that the subjective standard in the attendance policy is guided by business need, which is an objective standard.

The TMDC attendance policy provides that unsatisfactory attendance is determined by an assessment of individual employee circumstances, which involves the individual manager's "judgment and discretion after reviewing the employee's specific set of circumstances."  The Court is unable to find that the discretionary portion of the TMDC attendance policy is probative of discrimination relating to plaintiff's negative evaluation for 2007 and resulting denial of a merit increase.  Plaintiff met with Sade and Schlegel on or before April 1, 2008 to discuss the performance review and signed the performance review on that date.  Therefore, defendant's decision not to allow plaintiff to use vacation to cover absences after this date, or its decision not to allow plaintiff to make up time after this date, does not relate to the alleged unlawful employment actions of her negative employee evaluation for 2007 and the denial of a merit increase based on that evaluation.  Moreover, this evidence does not call into question defendant's other stated reasons for plaintiff's negative performance evaluation in 2007—the uncontroverted fact that plaintiff was the subject of consumer complaints that year and that performance metrics demonstrated that her work productivity was lower than other employees, despite the fact that she was more senior and experienced.  She completed far fewer subscriptions than her peers despite being assigned only that job for a period of time in 2007.

The Court is also unable to find that the discretionary portion of the TMDC attendance policy provides evidence of discrimination or pretext on the termination claim.  Defendant contends that plaintiff was terminated for unsatisfactory attendance.  The determination of whether absences and tardies were unexcused is not at issue—it is uncontroverted that plaintiff

had thirty-seven instances of unexcused absences in 2007.  The only subjective determination at issue is the manager's decision to allow plaintiff to make up her absences and tardies and to allow her to use vacation time.  Plaintiff's attendance problem was documented in a written warning in September 2007, which states that "[f]ailure to show immediate, continued, and sustained improvement in attendance or to follow the above directions will result in disciplinary action up to and including termination."  Plaintiff had documented unexcused absences and tardies after this warning and defendant would have had cause to discipline her for that reason much earlier than April 1, 2008.  In April 2008, plaintiff received a second written warning for unexcused absences and tardiness on April 1, 2, 9, 10, and 11, 2008.  Plaintiff also met with Sade and Schlegel on April 14 to discuss this written warning.  Plaintiff was advised that if her attendance did not improve, she could be subject to termination.

Plaintiff's attendance did not improve, and it is uncontroverted that she had unexcused absences and tardies after her second warning.  Prior to her FMLA approval, the attendance policy considered her April absences as unexcused.  Plaintiff was also late to work on May 27, 2008; Schlegel declined to allow plaintiff to make up this time.  And on May 28, 2008, plaintiff left Schlegel a voice mail advising that she would not be at work that day.  This absence was unexcused because plaintiff left a voicemail instead of speaking to someone physically, a violation of the attendance policy by any objective measure.  The fact that plaintiff's supervisors did not exercise their discretion in allowing her to make up this time does not raise a genuine issue of material fact about discrimination or pretext.

Given the uncontroverted facts in this case, it is apparent that the determination that

plaintiff had unsatisfactory attendance was not a "wholly subjective" determination.[39]  Given that plaintiff objectively violated the attendance policy and had been warned twice that future attendance issues could result in termination, the Court does not find that the subjective criteria at issue in this case makes the defendant's reason for terminating plaintiff suspect.  To the extent the attendance policy has a subjective component, the decisions in this case were supported with objective evidence.  One such piece of objective evidence is plaintiff's 2006 performance evaluation, written before the warnings began, which documented that plaintiff's absenteeism adversely affected the TMDC by increasing the burden on her peers in the call center.  Moreover, this case does not involve subjective evaluation criteria used by defendant to justify termination, and the Court does not find that *Garrett* and similar cases control the outcome here.

### 3.        Acting Contrary to Unwritten Company Policy or Practice

Plaintiff urges that prior to April 1, 2008, plaintiff had been allowed routinely to make up time for her absences and tardies and to use vacation time to cover absences due to sickness or medical conditions.  After April 1, 2008, Schlegel declined to make these accommodations.  Plaintiff maintains that this change in April 2008 shows that defendant acted contrary to an unwritten company practice.  As with plaintiff's subjective criteria argument, this evidence is not probative of plaintiff's claims about the negative 2007 evaluation or denial of a merit increase because those decisions were made on or before April 1, 2008.  This evidence is only material with respect to defendant' decision to terminate plaintiff for unsatisfactory attendance.

It is uncontroverted that, prior to April 1, 2008, plaintiff was routinely allowed to make up time for absences and tardiness after 5:00 p.m., even when a supervisor was not available.  At

---

[39]*See Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1195 (10th Cir. 2006).

best, this evidence suggests that HBC had an unwritten practice with respect to plaintiff only. Moreover, the Court does not find that defendant's prior accommodation raises a genuine issue of material fact about its decision to terminate plaintiff for unsatisfactory attendance. The uncontroverted facts show that plaintiff was the beneficiary of lenient enforcement of the TMDC attendance policy for years. There is no dispute that plaintiff accumulated a high amount of unexcused absences and that these absences and tardies violated the TMDC attendance policy. The policy does require the approval of a supervisor to make up time for unexcused absences and to use vacation time to cover sickness or other unexcused absences. Yet, plaintiff was typically allowed to make up her repeated absences and tardies or use vacation time, if available, to cover her unexcused absences.[40] After April 1, 2008, plaintiff's supervisors declined to enforce the attendance policy leniently, compared to plaintiff's past experience. The evidence is uncontroverted that lenient treatment, in addition to written warnings, failed to turn around plaintiff's poor attendance and pattern of unexcused absences. The record shows that plaintiff's attendance policy violations "continued unabated, showing the futility of disciplinary actions short of termination."[41] Given this record, the Court cannot find that defendant's decision to stop accommodating plaintiff's absenteeism creates a genuine issue of material fact about whether it discriminated against plaintiff when it terminated her, nor about the veracity of its stated reason for her termination.

### 4.     Disturbing Procedural Irregularities

Next, plaintiff argues that defendant failed to place plaintiff on a PIP prior to termination, which is inconsistent with normal company procedure. This evidence is only material with

---

[40]It is uncontroverted that plaintiff was approved to use vacation on June 11, 2008.

[41]*Crowe*, 649 F.3d at --.

respect to plaintiff's termination claim.  It is controverted whether placing an employee on a PIP

constituted "company procedure" at the time of plaintiff's termination.  Plaintiff relies on Sade's

testimony that in the TMDC, "we go through a process before anyone is terminated," that

includes placing the employee on a PIP, which plaintiff's negative performance evaluation for

2007 would have triggered.  And the evidence shows that plaintiff's supervisors did discuss

placing plaintiff on a PIP and drafted a PIP document, yet ultimately decided against it.

Defendant cites Sade's and Daughhetee's testimony and argues that a PIP was not mandated by

company policy and that the utility of a PIP depended on the situation.  Daughhetee testified that

a PIP was not appropriate for employees who exhibit chronic problems, such as plaintiff's

attendance problem.  Instead, those employees are more susceptible to written warnings and

reprimands before termination.

Evidence of pretext may include "disturbing procedural irregularities."[42]  But "the mere

fact that an employer failed to follow its own internal procedures does not necessarily suggest

that the substantive reasons given by the employer for its employment decision were

pretextual."[43]  It is uncontroverted that there was no written progressive discipline policy that

required defendant to place an employee on a PIP prior to termination.  In fact, plaintiff's only

evidence of any such policy is Sade's deposition testimony that "we go through a process before

anyone is terminated."  The written attendance policy instead provides that violations of the

policy may include corrective action via verbal and written counseling and that subsequent

occurrences of unsatisfactory attendance may result in further disciplinary action, including

---

[42]*Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999).

[43]*Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1222 (10th Cir. 2007).

termination.  It is uncontroverted that defendant followed this policy by issuing plaintiff two written warnings prior to termination.

Moreover, Daughhetee, the Human Resources representative who participated in the termination decision and the termination itself, testified that a PIP was not warranted in this case because other forms of progressive discipline were utilized; namely, written warnings.  Plaintiff was twice warned that her pattern of unexcused absences and tardies was unacceptable and that failure to improve her attendance could result in termination.  These written warnings did not inform plaintiff that she would first be placed on a PIP before termination.  Of course, the written warnings sought to achieve the same outcome as a PIP—progressive disciplinary action that attempted to put a stop to plaintiff's chronic attendance problems short of termination.  Even assuming that defendant deviated from a procedural regularity, "the standard for establishing pretext requires evidence of not just any procedural shortfall, but of a 'disturbing procedural irregularity,' often exemplified by an employer's 'falsifying or manipulating of relevant criteria.'"[44]  Under the circumstances of this case, failure to place plaintiff on a PIP does not constitute a disturbing procedural irregularity that gives rise to an inference of discrimination or pretext for discrimination.

### 5.    False Explanations

Plaintiff next argues that defendant has come forward with false explanations for its adverse employment actions.  Specifically, plaintiff asserts the following explanations are false: (1) plaintiff completed significantly fewer subscriptions and sales orders per day than her peers in the call center in 2007; (2) plaintiff did not make up her tardiness on April 2, 2008; and (3) plaintiff was not approved to use vacation to cover her absences on June 10 and 11, 2008.

---

[44] *Cooper v. Wal-Mart Stores, Inc.*, 296 F. App'x 686, 696 (10th Cir. 2008) (citations omitted).

In *Reeves v. Sanderson Plumbing Products, Inc.*,[45] the Supreme Court explained that a defendant's false explanation of the proffered reason for the adverse employment action is one form of circumstantial evidence that may be persuasive.[46]

> In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

> This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.[47]

Plaintiff's first assertion of falsity relates only to the claims that plaintiff was discriminated against by the unfavorable performance evaluation in 2007 and the resulting denial of a merit increase. Plaintiff submitted no evidence that the 2007 Performance Metrics were

---

[45] 530 U.S. 133 (2000).

[46] *Id.* at 147.

[47] *Id.* at 147–48 (citations omitted).

incorrect.  Plaintiff testified that she believed they were not a fair assessment of her production because for part of the year she worked on billings instead of subscriptions.  Plaintiff also points to Schlegel's testimony that the Performance Metrics do not break down numbers for various periods of time in 2007.  But the performance evaluation for 2007 acknowledged plaintiff's shifting duties in the department.  In fact, it explains that she was given the task of subscription renewals for the first quarter before switching back to her normal job responsibilities which should have increased her production numbers.  The 2007 evaluation cites the low performance metrics, as well as customer complaints and attendance problems, in commenting that plaintiff did not perform to the level that an employee with her experience would be expected to perform.  Even assuming that plaintiff is correct that the Performance Metrics were skewed by her shifting job responsibilities, this does not account for the entire explanation provided in her performance evaluations for her poor rating.  Thus, the Court is unable to find a genuine issue of material fact about whether defendant's stated reason for plaintiff's negative performance evaluation for 2007 is a pretext for discrimination.

The next two assertions of falsity concern whether certain absences were excused leading up to plaintiff's termination in June 2008.  These allegedly false explanations only relate to plaintiff's termination claim as they occurred after the performance evaluation and resulting denial of a merit increase.  Plaintiff argues that she made up her time on April 2, 2008 and utilized vacation time for her absence on June 10 and 11, 2008.  The timeline of these events belies plaintiff's allegation of falsity.  The facts demonstrate that on April 14, 2008, plaintiff received a written warning for unexcused absences and tardiness on April 1, 2, 9, 10, and 11, 2008.  Plaintiff also met with Sade and Schlegel on April 14 to discuss this written warning.  Later, on April 17 and May 7, plaintiff received FMLA approvals for some of these dates.  And

the HBC time records show that plaintiff was actually allowed to make up her hours for April 2 and part of April 1.

Plaintiff called in sick to work on June 10 and 11, 2008, reporting back and neck pain and a headache. Schlegel reported plaintiff's absences to Daughhetee. Plaintiff states in her deposition that she requested to use vacation time to cover both absences from a "team lead" and received verbal approval to do so. Plaintiff does not indicate who approved these requests. Schlegel testified that she typically approved a request to use vacation time when plaintiff was ill so long as she had such time available. Yet, HBC's records show plaintiff was approved to use vacation on June 11, but not on June 10. On June 12, plaintiff submitted an FMLA leave request for her absences on June 10 and 11, 2008, but that request was not received by defendant until June 16, 2008, after plaintiff's termination. Given that these absences on April 2, July 10 and July 11 were initially unexcused, the Court declines to find that this is an appropriate circumstance where the trier of fact could reasonably infer from the falsity of the explanation for plaintiff's termination that the employer is "dissembling to cover up a discriminatory purpose." Instead at the time plaintiff was counseled on April 14, the record reflects that her supervisors believed her April 2 absence was one of many other unexcused absences. On June 10 and 11, the record shows that Schlegel emailed Daughhetee that plaintiff's absences on those days were unexcused. Even if Schlegel or some other team lead did verbally approve plaintiff's vacation request, plaintiff points to no evidence in the record that Daughhetee was aware of this request. And plaintiff's FMLA requests for June 10 and 11 were not received until after her termination.

Moreover, even assuming that defendant falsely attributed these dates as unexcused absences, it does not constitute dishonesty about a material fact since there were several other absences that were undisputedly unexcused, which formed the basis for plaintiff's termination.

Plaintiff received a warning on September 20, 2007 that future unexcused absences or tardies may form the basis for dismissal.  Yet, she continued to accrue unexcused absences and tardies after this written warning during the remainder of 2007 and the beginning of 2008.  Also, on May 27, 2008, plaintiff was late arriving to work, which was an unexcused absence.  And on May 28, 2008, plaintiff left Schlegel a voice mail advising that she would not be at work that day because she was nauseous and taking medication.  Because plaintiff left a voicemail instead of speaking to someone physically, this absence was deemed unexcused.  Given the sheer volume of plaintiff's unexcused absences and instances of tardiness, defendant's incorrect attribution of three dates as unexcused is insufficient to create a genuine issue of material fact that defendant's stated reason for plaintiff's termination is untrue.

### 6.       Inconsistencies and Contradictions

Plaintiff argues that her superiors have inconsistently attributed the termination decision to different individuals, evidencing discriminatory motive.  Specifically, plaintiff argues it is suspect that Sade and Schlegel each testified that it was not their decision to terminate plaintiff, while Daughhetee testified that they both participated in the decision to terminate plaintiff.

A plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[48] The Court is to look to the facts as they appeared to the person making the decision.[49]  Plaintiff misconstrues this standard, which focuses on inconsistencies in the defendant's proffered reason for the adverse employment action.  Instead plaintiff merely points to an alleged inconsistency in

---

[48]*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).

[49]*See, e.g.*, *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 948 (10th Cir. 2011).

the testimony about who participated in the termination decision.  This evidence does not bear on the credibility of defendant's stated reason for the termination—plaintiff's attendance problems.  Moreover, the cited-to testimony is not inconsistent.  The record is clear that only Daughhetee and Graber were present for plaintiff's termination.  Daughhetee testified about a meeting prior to June 2008 with Graber, Sade, and Schlegel where a collective decision was made to terminate plaintiff due to her attendance problems.  But according to Sade and Schlegel's testimony, neither participated in the decision to terminate plaintiff.  Sade learned from Daughhetee by email that plaintiff had been fired, but testified that she had previously indicated to Daughhetee and Graber that she would recommend termination if plaintiff's attendance problems did not improve.  The record is clear that plaintiff's attendance did not improve and instead worsened.  Therefore, the Court is unable to find that this evidence is sufficient to demonstrate that plaintiff's proffered reason for plaintiff's termination is a pretext for race discrimination.

In sum, the circumstantial evidence relied on by plaintiff does not establish a genuine issue of material fact with respect to either her prima face case of race discrimination or that HBC's proffered reasons for the adverse employment actions are unworthy of credence.

## C.    Retaliation under Title VII

The elements of a prima facie claim of retaliation under Title VII are: (1) the employee engaged in protected opposition to discrimination; (2) the employee suffered an adverse employment action during or after his protected opposition that a reasonable employee would have found materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action.[50]

Plaintiff points to three instances of protected opposition to race discrimination: (1) on

---

[50]*E.g.*, *McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006).

July 11, 2007, when she met with Sade and Schlegel; (2) on or before April 1, 2008, when she

met with Sade and Schlegel regarding her attendance; (3) on or before April 14, 2008, when she

met with Sade and Schlegel regarding her attendance; (4) on June 4, 2008, when she met with

Daughhetee; and (5) on June 12, 2008, when she met with Daughhetee.  With respect to the

second element, plaintiff claims that she was subjected to three adverse employment actions: (1)

the September 20, 2007 written warning regarding her attendance; (2) the April 14, 2008 written

warning regarding her attendance; and (3) her termination.

Defendant contends that plaintiff is unable to come forward with evidence to establish a

genuine issue of material fact on her prima facie case for several reasons.  As an initial matter,

the Court declines to consider the September 20, 2007 written warning as an adverse

employment action in this matter, as this claim was not exhausted.  Plaintiff filed her

administrative charge on October 13, 2008.  Therefore, to be timely, the unlawful practice must

have taken place after December 18, 2007.  The first written warning on September 20, 2007 was

therefore not exhausted.[51]

Next, defendant argues that plaintiff is unable to establish a causal connection between

the protected opposition in this case and the adverse employment action.  Plaintiff must establish

a genuine issue of material fact that plaintiff's April 14, 2008 written warning or her termination

in June 2008 were causally connected to one of the five instances of protected opposition.  The

Court assumes without deciding, for the purposes of summary judgment, that plaintiff can

establish a prima facie case of retaliation.  Defendant has come forward with a legitimate non-

discriminatory explanation for plaintiff's written warning and termination—plaintiff's

---

[51]*See* 42 U.S.C. § 2000e-5(e)(1); *EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 110 (1988); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

unsatisfactory attendance.  The Court proceeds to consider whether plaintiff can establish a genuine issue of material fact that this explanation is unworthy of belief.

Plaintiff points the Court to eight pieces of circumstantial evidence in support of her contention that defendant's explanation for her April 2008 written warning and termination are a pretext for retaliation for plaintiff's protected opposition to race discrimination.  Six of these eight arguments were previously discussed with respect to plaintiff's race discrimination claims: the use subjective criteria, actions contrary to an unwritten policy or practice, deviations from normal company procedure, false explanations, and inconsistencies.  For the reasons already explained, the Court is unable to find that this evidence creates a genuine issue of material fact that defendant's reliance on plaintiff's poor attendance is a pretext for discrimination.  In addition to these six arguments, plaintiff argues that defendant's prior treatment of plaintiff and the temporal proximity between the protected opposition and the adverse employment actions constitute evidence of pretext.

### 1.    Prior Treatment of Plaintiff

Plaintiff points to the volume of her unexcused absences in 2005 and 2006 and the fact that, despite these unexcused absences, she received merit increases and did not receive written warnings.  Plaintiff urges that she only received written warnings and a poor performance evaluation only after she complained of race discrimination for the first time in July 2007.  In order to show pretext, plaintiff must come forward "with evidence that defendant treated plaintiff differently than it treated him in prior similar circumstances."[52]

First, the Court notes that plaintiff's performance evaluations for 2005 and 2006 are not

---

[52]*Hysten v. Burlington N. & Santa Fe. R.R.*, 44 F. App'x 411, 417 (10th Cir. 2002); *see also Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1174 (10th Cir. 2006).

without criticism of plaintiff's attendance record.  Although plaintiff was rated as "meets expectations" in 2003, 2004, and 2006, her performance evaluations noted that she struggled with attendance and tardiness issues, which increased the burden on her co-workers and decreased her productivity.  Defendant's dissatisfaction with plaintiff's attendance problems was not significantly different prior to July 2007 so as to call into question its enforcement through written warnings beginning in September 2007.  There is no evidence to suggest that defendant's criticism of plaintiff's attendance beginning in 2007 was "inflated or exaggerated" in order to retaliate against plaintiff.  At best, the evidence shows that defendant leniently enforced its attendance policy prior to that date.

Finally, the Court notes that plaintiff previously complained of discrimination in 2005 after the Huffman incident.  Despite the fact that her absenteeism was a consistent problem at this time, defendant did not issue plaintiff formal written warnings about her attendance for two years.  The Court does not "act as a super personnel department that second guesses employers' business judgments."[53]  In this case, the uncontroverted facts show that defendant exercised its business judgment to strictly enforce its attendance policy and actually discipline plaintiff for her consistent and numerous violations.  The evidence presented by plaintiff is insufficient to call into question this business judgment.

## 2.    Temporal Proximity

Plaintiff argues that the close temporal proximity between the protected opposition and the adverse employment actions in this case justifies an inference of retaliatory motive. Defendant argues that the adverse employment actions are too remote compared to the protected activity.  The Tenth Circuit has made clear that "temporal proximity alone is not sufficient to

---

[53]*Jones v. Barnhart*, 349 F.3d 1260, 1267 (10th Cir. 2003).

defeat summary judgment by showing that the employer's proffered reason is actually pretext for retaliation."[54]  The Court has already found that the other reasons offered by plaintiff are insufficient to defeat summary judgment, so even assuming that the adverse employment actions in this case were "very close" in proximity to the protected opposition, it would not meet the more demanding burden that the plaintiff carries in demonstrating pretext, as compared to the prima facie case.[55]

Accordingly, the Court finds that plaintiff has failed to point to sufficient evidence in the summary judgment record to demonstrate a genuine issue of material fact on an essential element of her claim for retaliation under Title VII and summary judgment is entered in favor of defendant on this claim.

### D.        Retaliation under the FMLA

The FMLA entitles a qualified employee to up to twelve weeks of leave during any twelve month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."[56]   Similar to retaliation claims under Title VII, to state a prima facie case of FMLA retaliation, plaintiff must show that: (1) she engaged in a protected activity; (2) defendant took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action.[57]

Defendant argues that plaintiff cannot establish a prima facie case of retaliation because

---

[54]*Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1066 (10th Cir. 2009); *see also Annett v. Univ. of Kan.*, 371 F.3d 1233, 1241 (10th Cir. 2004).

[55]*Annett*, 371 F.3d at 1241.

[56]29 U.S.C. § 2612(a)(1)(D).

[57]*Metzler*, 464 F.3d at 1171 (citation omitted).

she cannot establish a causal connection between plaintiff's FMLA leave requests and her

attendance warning on April 14, 2008.  Moreover, defendant argues that plaintiff cannot

establish a causal connection between her leave request in June 2008 and her termination.

Temporal proximity is relevant evidence of a causal connection "sufficient to justify an inference

of retaliatory motive."[58]  Unlike the pretext analysis described on plaintiff's Title VII retaliation

claim, very close temporal proximity alone is sufficient to establish a causal connection for the

purpose of the prima facie case.[59]

Plaintiff identifies the following protected activity on this claim: (1) her FMLA approved

leave on September 26 through November 5, 2007; (2) her FMLA approved leave on April 9

through 11; and (3) her June 12, 2008 FMLA leave request.  None of these instance of protected

activity were followed closely by the adverse employment actions alleged by plaintiff.  The 2007

leave period was too remote in time—over five months—from the April 14, 2008 attendance

warning.[60]  While it is true that plaintiff was ultimately approved for FMLA leave on April 9

through 11, 2008, that approval was not made until at least April 17, 2008, the date it was

received by Human Resources.  Therefore, there could be no retaliation on April 14, 2008 for

plaintiff's use of FMLA leave that had not yet been requested.  If anything, this time lapse

indicates that despite her attendance warning, defendant was once again inclined to

accommodate plaintiff by retroactively approving FMLA leave for her unexcused absences.

Finally, plaintiff points to her June 12, 2008 FMLA request, which was made one day

---

[58]*Id.* (quotation omitted).

[59]*Annett*, 371 F.3d at 1240–41.

[60]*Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) (finding that a three-month period between protected activity and adverse action is insufficient, standing alone, to establish causation).

36

prior to her termination.  But, again, it is uncontroverted that this request was not received by

Human Resources until after the adverse employment action occurred.  The receipt stamp

indicates that Human Resources did not receive the first request for FMLA leave until June 16,

2008, after plaintiff's termination.  Because plaintiff is unable to show close temporal proximity

between the protected activity and the adverse employment action, the Court finds no genuine

issue of material fact that there is no causal connection between any of plaintiff's protected

activity and the adverse employment actions.

Even if plaintiff could succeed in creating a genuine issue of material fact on her prima

facie case by showing temporal proximity, defendant has come forward with a legitimate

explanation for the adverse employment action—plaintiff's violation of the attendance

policy—and plaintiff cannot succeed in creating a genuine issue of material fact that this reason

is a pretext for FMLA retaliation.  The Court has already considered and rejected all of the

circumstantial evidence pointed to by plaintiff in support of her claim that a reasonable jury

could infer either a causal connection,[61] or that defendant's attendance-based reason for

disciplining plaintiff was a pretext for retaliation.[62]  Moreover, the uncontroverted facts show a

---

[61]In addition to temporal proximity, plaintiff points to: (1) defendant's use of subjective criteria to determine that her attendance was unsatisfactory; (2) defendant's actions that were contrary to an unwritten company policy or practice; (3) deviations from normal company practices; and (4) prior treatment of plaintiff.  But plaintiff does not explain how any of these arguments bear on the question of causation, given the problematic timeline between her protected activity and the adverse employment actions.  Moreover, the Court has considered and rejected all of these arguments on plaintiff's race discrimination and retaliation claims.

[62]While not raised by plaintiff in her analysis, the summary judgment record reflects that plaintiff recalls an instance when Schlegel told her that if she "kept using FMLA or being absent or so, that there was a chance that I was going to be terminated."  Even if the Court considered this evidence, it would not be sufficient to establish pretext on plaintiff's FMLA retaliation claim.  Plaintiff cannot recall when she heard this comment and it is too ambiguous and isolated for a reasonable jury to find FMLA retaliation occurred in this case.  *See Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994); *Mondaine v. Am. Drug Stores, Inc.*, 408 F. Supp. 2d 1169, 1197 (D. Kan. 2006) (explaining that there must be a nexus between the alleged discriminatory statements and the adverse employment action).

substantial amount of approved FMLA leave starting as early as 2002; yet, the earliest time that plaintiff asserts an adverse employment action was September 2007.  For all of these reasons, the Court finds that summary judgment is appropriate on plaintiff's FMLA retaliation claim.

### E.      Disability Discrimination

The ADA prohibits employers from discriminating on the basis of disability.[63]  The elements of a prima facie case of ADA discrimination are: (1) plaintiff is a disabled person as defined by the ADA; (2) plaintiff is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) plaintiff suffered discrimination by an employer or prospective employer.[64]

The Court assumes without deciding that plaintiff is a disabled person under the ADA and that she can establish a prima facie case of disability discrimination.  Defendant has come forward with a legitimate non-discriminatory reason for disciplining plaintiff—violation of the TMDC attendance policy.  As described at length on plaintiff's other claims for relief, none of the circumstantial evidence relied upon by plaintiff suggests that defendant's reasons for disciplining plaintiff, either by issuing written warnings or termination, are a pretext for discrimination or retaliation.  Accordingly, defendant's motion for summary judgment is granted on this claim.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion for Summary Judgment (Doc. 55) is **granted**.

**IT IS SO ORDERED**.

---

[63]42 U.S.C. § 12112(a).

[64]*Zwygart v. Bd. of Cnty. Comm'rs of Jefferson Cnty., Kan.*, 483 F.3d 1086, 1090 (10th Cir. 2007); *Bones v. Honeywell, Int'l, Inc.*, 366 F.3d 869, 877–78 (10th Cir. 2004).

Dated: October 11, 2011

                                S/ Julie A. Robinson

                                JULIE A. ROBINSON
                                UNITED STATES DISTRICT JUDGE